IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **ALEXANDRA L. LEE o/b/o** * | |
| **KIARA L. WILLIAMS,** * | |
| * | |
| **Plaintiff,** * | |
| * | |
| vs. * | **Civil Action No. 04-00755-WS-B** |
| * | |
| **JO ANNE B. BARNHART,** * | |
| **Commissioner of** * | |
| **Social Security,** * | |
| * | |
| **Defendant.** * | |

## REPORT AND RECOMMENDATION

Plaintiff Alexandria L. Lee (hereinafter "Plaintiff") brings this action on behalf of her minor child Kiara L. Williams (hereinafter "Kiara"), seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383f. This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The parties waived oral argument (Docs. 14 & 15). Upon careful consideration of the administrative record, and the memoranda of the parties, the undersigned respectfully recommends that the decision of the Commissioner be **AFFIRMED**.

**I.    Procedural History**

Plaintiff protectively filed, on December 6, 2002, an application for supplemental security income benefits on behalf of her daughter Kiara, alleging that she has been disabled since April 16, 1998 due to a specific learning disability and an adjustment disorder with a depressed mood. (Tr. 46-48, 75-79). Plaintiff's claim was denied on initial consideration on April 2, 2003. (Id. at 43-51). Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (Id. at

55-56). On December 3, 2003, an administrative hearing was held before ALJ James D. Smith ("ALJ Smith"), which was attended by Plaintiff and Kiara. (Id. at 32-42). In a decision dated March 25, 2004, ALJ Smith determined that Kiara was not disabled because she does not have an impairment or combination of impairments that meet, medically equal or functionally equal any impairment in the Listings; thus, Plaintiff's claim was denied. (Id. at 22-31). Plaintiff's request for review was denied by the Appeals Council, thus making the ALJ's decision the final decision of the Commissioner of Social Security. (Id. at 5-7, 12-15, 17-18). The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. § 405(g).

**II.     Background Facts**

Kiara was born on July 11, 1989 and was 14 years old and in the 8th grade at the time of the administrative hearing. (Tr. 35-36, 75). Kiara had to repeat the 1st grade and was placed in special education classes. (Id. at 35-36). According to Plaintiff, Kiara is overweight and cannot run or play like other children. (Id. at 36). She also tires easily, has trouble sleeping and bites her nails a lot. (Id.) Kiara's daily activities consist mainly of catching the school bus and attending school. (Id.) When not at school, Kiara spends a lot of time in her room scribbling because she is not given homework. (Id. at 36-37). According to Plaintiff, Kiara typically draws during school, and although she receives all E's, she has progressed to the 8th grade because "they just [continue] passing her." (Tr. 36-37). Plaintiff testified that she helps Kiara learn at home; however, she does not receive the same type of help at school. (Id. at 37-38, 40). Thus, she is unable to "to count and do stuff like that." (Id. at 40-41).

Plaintiff reported that Kiara has disciplinary problems and has been placed in the "CHINS" program (e.g., she needs to learn right from wrong, including punishment). (Id. at 38-39). Kiara

is seen by Dr. Dillon every two to four weeks, and is provided with medication that helps with her behavior. (Id. at 37, 39-40). According to Plaintiff, when Kiara is on her medication, "she [is] a different child[]" – she is calmer, not as volatile, and does things asked of her. (Id. at 40).

### III. Issues on Appeal

A.  Whether the ALJ erred in failing to find that Kiara's impairments functionally equal Listing 112.02 because she suffers from marked limitations in the domains of acquiring and using information and interacting and relating with others?

B.  Whether the ALJ erred in failing to obtain a disability opinion from Kiara's treating physician, Dr. Dillon, and in assigning Dr. Bertucci's opinion controlling weight?

### IV. Analysis

#### A. Standard of Review

In reviewing claims brought under the Act, this Court's role is limited to determining: 1) whether the decision of the Secretary is supported by substantial evidence, and 2) whether the correct legal standards were applied. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[1] A court may not decide the facts anew, rough the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]"). In determining whether substantial evidence exists, this Court must view the record as a whole, taking into account evidence favorable and unfavorable to the Commissioner's

---

[1]This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

decision. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

### B. Childhood Disability Law

The Personal Responsibility and Work Opportunity Act of 1996, which amended the statutory standard for children seeking supplemental security income benefits based on disability, became effective on August 22, 1996. See Pub. L. No. 104-193, 110 Stat. 2105 § 211(b)(2) (1996) (codified at 42 U.S.C. § 1382c). The definition of "disabled" for children is:

> An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

See 42 U.S.C. § 1382c(a)(3)(C)(i), 20 C.F.R. § 416.906.[2] The regulations provide a three-step sequential evaluation process for determining childhood disability claims. 20 C.F.R. § 416.924(a).

At step one, a child's age/work activity, if any, are identified to determine if she has engaged in substantial gainful activity. At step two, the child's physical/mental impairments are examined to see if she has an impairment or combination of impairments that are severe. Under the regulations, a severe impairment is one that is more than "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c). To the extent the child is determined to have a severe impairment, at step three, she must establish that the impairment results in marked/severe functional limitations. 42 U.S.C. § 1382c(a)(3)(C)(i). The regulations set forth that an "impairment(s) causes marked and severe functional limitations if it

---

[2]On September 11, 2000, the Commissioner published Final Rules for determining disability for a child under the age of 18. See 65 Fed. Reg. 54,747, corrected by 65 Fed. Reg. 80,307. These rules became effective on January 2, 2001 and apply to Plaintiff's claim. See 65 Fed. Reg. at 54,751.

meets, medically equals or functionally equals the listings." 20 C.F.R. § 416.924(d).

A child's impairment(s) meets the Listings' limitations if she actually suffers from limitations specified in the Listings for her severe impairment. 20 C.F.R. § 416.926(d). A child's impairment medically equals the Listings if her limitations are at least of equal severity and duration to the listed impairment(s). Id. Where, as in this case, a child's impairment or combination of impairments does not meet or medically equal any Listing, then the Commissioner must determine whether the impairment or combination of impairments results in limitations which functionally equal the criteria for a Listing.[3] Id. In doing so, the regulations require consideration of six domains:[4] 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for oneself; and 6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). To satisfy the functionally equivalent standard, a child must have either a "marked" limitation in two domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a).[5] A marked limitation is defined as one that "interferes seriously with his [the child's] ability to independently initiate, sustain or complete activities."[6] 20 C.F.R. § 416.926a(e)(2)(i). An

---

[3] In making this assessment, the reports of the State Agency medical consultants, reports of other treating, examining and non-examining medical sources and, the claimant's symptoms, including pain and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, are all taken into consideration. 20 C.F.R. §§ 416.927, 416.929; and SSR 96-5, 96-6p and 96-7p.

[4] The degree of limitation in the relevant domains is assessed within four ranges: 1) no evidence of a marked limitation; 2) less than marked limitation; 3) marked limitation; and 4) extreme limitation. 20 C.F.R. § 416.926a(b)(1).

[5] The regulation sets forth the methods for using each domain to evaluate functional equivalence to a Listing. 20 C.F.R. § 416.926a(f).

[6] Marked limitation also means a limitation that is: "'more than moderate but 'less than extreme.'" 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation may arise when several activities or functions are limited or when one is limited. Id. A child has a marked limitation when she has a valid score two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and the child's day-to-day functioning in domain related activities is consistent with the score. 20 C.F.R. § 416.926a(e)(2)(iii).

extreme limitation is one that "interferes very seriously with [the child's] ability to independently initiate, sustain or complete activities."[7]  20 C.F.R. § 416.926a(e)(3)(i).  If the child is extremely limited in one domain or markedly limited in two domains, the impairment is functionally equivalent to the relevant Listing, id. § 416.926a(a), and the child is disabled, id. § 416.924(a).  In conducting this analysis, the ALJ may take a wide range of evidence into account, including an individual's statements about symptoms along with information provided by treating or examining physicians, and all other relevant evidence in the record.  20 C.F.R. §§ 416.912, 416.913(d) and 416.924a; SSR 96-7p.  See, e.g., Shinn v. Commissioner of Social Security, 391 F.3d 1276, 1283-1284 (11th Cir. 2004).

In the case sub judice, the ALJ determined that Kiara has not engaged in substantial gainful activity and that she has the severe impairments of a learning disorder, attention deficit hyperactivity disorder ("ADHD"), hyperactivity disorder and an adjustment disorder.  (Tr. 30, Findings 2-3).  The ALJ also found that Kiara does not have an impairment listed in, or medically equal to, one in the Listings.  (Id., Finding 4).  The ALJ concluded that Kiara does not have severely disabling limitations in specific functions caused by a medically determinable physical/mental impairment or disabling limitations.  (Id., Findings 5-7).  He further concluded that Kiara has no limitations in the domains of moving about/manipulating objects, caring for onself and health/physical well-being; less than marked limitations in the domains of acquiring/using information and attending/completing tasks; and a marked limitation in the domain of interacting/relating with others.  (Id. at 30-31, Finding 8).  Based on these findings, the ALJ concluded that Kiara is not disabled.  (Id., Finding 10).

On appeal, Plaintiff has not challenged the ALJ's finding that Kiara's impairments do not

---

[7]Extreme limitation also means a limitation "more than marked" and may arise when several activities or functions are limited or when one is limited. 20 C.F.R. § 416.926a(e)(3)(i).

meet or medically equal a Listing. Rather, Plaintiff argues that: 1) the ALJ erred by finding that Kiara's impairments do not functionally equal Listing 112.02 as the evidence supports a finding of "marked" limitations in the two domains of interacting/relating with others[8] and acquiring/using information; and 2) the ALJ erred in failing to obtain a disability opinion from Kiara's treating physician.

Contrary to Plaintiff's assertions, the ALJ's decision is supported by substantial evidence. At the third step of the sequential analysis, the ALJ concluded that Kiara's impairments did not functionally equal any listing because while she is markedly limited in the domain of interacting/relating with others, she is less than markedly limited in the domains of attending/completing tasks and acquiring/using information, and is not limited at all in the domains of moving/manipulating objects, caring for oneself and health/physical well being. (Tr. 24-31). The ALJ was correct in concluding that the record evidence does not establish that Kiara suffers from marked limitations in the domain of acquiring/using information. Specifically, in reaching his decision, the ALJ found as follows:

> . . . . Results of IQ testing performed by the School Board staff in 1997 show [she] . . . attained a Verbal IQ of 74, a Performance IQ of 74, and a Full Scale IQ of 72 on the Wechsler Intelligence Scale for Children, Third Revision (WISC-III). [She] . . . .underwent a battery of standardized tests, administered by the School Board staff in 2001, and test results show that claimant functions in an age-appropriate fashion and in the average range in almost all of the areas evaluated . . . .
> 
> \* \* \*
> 
> A Childhood Disability Evaluation Form was completed by Peter S. Bertucci, M.D., a State agency medical examiner. Dr. Bertucci found the claimant to have a less than marked limitation in the domain of acquiring and using information and in the domain of attending and completing tasks. IQ scores from 1997 show a Verbal IQ of 74, a Performance IQ of 72 and a Full Scale IQ of 72, and the records show that the claimant is in EMR classes. The Teacher Questionnaire dated January 2003 reflects

---

[8] As the ALJ already found that Kiara has a marked limitation in the domain of interacting/relating with others, said domain and evidence related to same need not be discussed further.

> some obvious, but not serious, problems in the domain of acquiring and using information . . . . In fact, the mental health clinic records from September to December 2003 document significant improvement in the domain . . . .
>
> It is important to emphasize that, despite the applicant's earlier allegations as to the severity of the claimant's condition, there is documentary evidence which refutes her claims. There is no evidence suggesting that the claimant is receiving any significant degree of help in performing age-appropriate activities that is more than would be expected for a normal child her age.  Furthermore, there is no evidence of any significant medicinal or treatment-related side effects that adversely affect the claimant's functioning.  Aside from having been assigned to special education classes, the claimant has not required any intensive therapy, either in or out of the school environment, due to the effects of her condition.
>
> Based on the objective evidence of record, the Administrative Law Judge finds the report of Dr. Bertucci is entitled to controlling weight. Specifically, Dr. Bertucci is a pediatric specialist who has considered the record in its entirety. Therefore, the Administrative Law Judge finds that the claimant possesses the following limitations:
>
> **Acquiring and Using Information**
>
> In this domain, the claimant has a less than marked limitation of functioning.
> \* \* \*
> . . . . In evaluating the claimant in the domain of acquiring and using information, the undersigned finds the claimant has a "less than marked" limitation. The WISC-III records from 1997 reflect a Verbal IQ score of 74, a Performance IQ score of 74, and a Full Scale IQ score of 72 for the claimant. Moreover, the Teacher Questionnaire from the claimant's special education case manager dated January 24, 2003 reflects some problems in this domain, none of which are marked as "serious." This same Teacher Questionnaire reflects no problems in any of the remaining domains. Further, the record reflects that the claimant has passing grades in all her classes . . . .
> \* \* \*
> The evidentiary record reflects that the claimant does not have any chronic illnesses which has produced severe limitations over an extended period of time. The claimant has not engaged in any early intervention program. There is no evidence of record, which indicates that the claimant's treatment has adversely affected her ability to function over a period of time. The record establishes that when the claimant so desires, she can initiate, sustain and complete activities. The claimant's impairment does not require treatment over a long period of time (at least a year), under circumstances where the treatment itself (e.g., multiple surgeries) results in marked and severe functional limitations. The record also reflects that the claimant was able to function in unfamiliar settings such as those present in consultative examinations.
> \* \* \*

(Tr. 27-29 (citations omitted)).

A review of the pertinent record evidence supports the ALJ's findings. The medical records reflect that in 1997, Kiara was admitted to the Youth Services Psychiatric Program of Charter Behavioral Health Systems of Mobile after setting fire to her mother's bedroom. (Tr. 168). Kiara was diagnosed with major depressive disorder and treated with medication. (Id. at 168-172, 180-181). Hospital records reflect slow improvement, and that after 15 days of hospitalization, Kiara was discharged on medication. (Id. at 167, 168).

On December 13, 1997, Kiara underwent psychological testing arranged through the Board of School Commissioners of Mobile County (Id. at 183-190). On the Wechsler Intelligence Scale for Children-III, Kiara obtained a verbal IQ of 74, performance IQ of 74, and a full scale IQ of 72, indicating borderline range of intellectual functioning. (Id. at 186).

In June 1998, Kiara's special education teacher, Polly Parrish ("Parrish"), completed a Teacher Questionnaire wherein she noted that Kiara performed below age level academically in comparison to normal children, and performed in the low group in comparison to other kids in her classroom. (Id. at 81-83). Parrish also indicated that Kiara was withdrawn and depressed, that she often argued with other kids, and that she was academically and socially deficit when compared to others in her age group. (Tr. 81-83). She further noted however, that Kiara was able to understand and follow directions, that she had no problems with self-help skills and that she had no physical problems. (Id.) Parrish also completed an annual progress report wherein she indicated that for the 1998-1999 school year, Kiara was making some progress towards her annual goals. (Id. at 163).

On July 7, 1998, Kiara underwent a consultative psychological evaluation by James Chudy, Ph.D. ("Dr. Chudy"), at the request of the State Agency. (Id. at 193-195). At that time, Plaintiff denied that Kiara exhibited any psychological or emotional problems and Dr. Chudy opined that

Kiara's ability to understand and complete simple instructions seemed "fair," and that she appeared to respond appropriately to others. (Id.) Dr. Chudy diagnosed Kiara with borderline intellectual functioning (by history), and he opined that a favorable response could not be expected in six to twelve months. (Id. at 195).

On July 30, 1998, State Agency psychological consultant Patricia Hinton, Ph.D. ("Dr. Hinton") reviewed Kiara's records and concluded that while her borderline intellectual functioning was a severe impairment, it did not meet, medically or functionally equal the severity of a Listing. (Tr. 196). Dr. Hinton found no limitations with regard to Kiara's motor, personal or concentration skills; a less than marked limitation with her social skills; a marked limitation with her cognitive and communicative abilities; and her ability to understand and complete simple instructions seemed fair given her psychological exam. (Id. at 198-199). She also found that while limitations existed, none of Kiara's limitations met/equaled a Listing. (Id. at 196-199).

On February 22, 2001 and April 2, 2001, Kiara was evaluated by Angela Wilson, M. Ed. ("Dr. Wilson"). (Id. at 201-209). On the Kaufman Assessment Battery for Children test ("K-ABC"), Kiara's intellectual functioning was found to be in the lower extreme-well below average range for sequential processing, in the well below average-below average range for simultaneous processing, and in the lower extreme-well below average range for mental processing. (Id. at 201-209). On the Comprehensive Form of the Kaufman Test of Educational Achievement ("K-TEA"), Kiara's scores were found to be in the 1st to 6th percentile (65-77). (Id.) Dr. Wilson concluded that Kiara's test scores indicated intellectual functioning in the lower extreme-well below average range; her achievement test scores in reading were consistent with the ability level obtained in a measure of intellectual ability; her achievement test scores in mathematics were significantly lower than her intellectual potential;

and no areas of behavioral difficulties were evidenced on the Devereux Behavior Rating Scale-School Form ("DBRS-SF"), as completed by Kiara's teacher. (Tr. 201-209). Dr. Wilson further opined that Kiara's adaptive behavior was comparable to, or higher than, her overall level of intellectual functioning at that time. (Id.)

A December 6, 2002 transcript issued from Calloway-Smith Middle School ("Calloway") reveals that Kiara received scores of 62, 63, 63, 68, 69, 77 and 82, in social studies, physical education, language arts, reading, science, math and basic learning, respectively. (Id. at 156). Calloway records around this time also reveal teacher comments regarding Kiara, which include the following: she demonstrated a poor attitude; rarely participated in class activities; continually wrote notes; did other "girly" activities in class; her class assignments were seldom completed; she does some of her work but never participates in group activities; "[s]he does nothing[;]" she has a bad attitude; she was worse than usual; she does not turn in her homework; and she scores very low on tests (10-15%). (Id. at 157-159, 161-162).

In January 2003, Ms. Craig, Kiara's case manager at Calloway, completed a Teacher Questionnaire on which she noted that Kiara had no problems interacting and relating with others, attending and completing tasks, moving and manipulating objects and/or caring for herself; and had slight problems comprehending oral instructions, proving organized oral explanations and adequate descriptions, learning new learning materials, and recalling and applying preciously learned materials. (Id. at 140-150). Ms. Craig also opined that Kiara had obvious problems understanding school and content vocabulary, reading and comprehending written material, comprehending and doing math problems, understanding and participating in class discussions, expressing ideas in written form, and applying problem solving skills in class discussions. (Id.) Ms. Craig did not indicate, however, that

11

Kiara had any "serious" or "very serious" problems in any area. (Tr. 140-150).

On March 6, 2003, Plaintiff underwent a consultative psychological evaluation by Lucille T. Williams, Psy. D. ("Dr. Williams") at the request of the State Agency. (Id. at 230-232). Dr. Williams found that Kiara was able to count backward from 20-1, recall 4 digits forward and 2 backward, recall recent/remote events, her range of affect was normal, she was oriented to time but not to situation, she was unable to subtract serial 7s from 100 or serial 3s from 20 but could subtract serial 2s from 10, she had problems in change making/simple math, she could spell cat forward/backward, she could recall 4 digits forward and 2 digits backward, and she could recall 2 of 3 words after 5 minutes. (Id.) Dr. Williams observed that Kiara's thought processes were grossly intact, she had no loose associations, tan-gential/circumstantial thinking noted, she did not appear confused, her conversation was normal, her rate of speech within normal limits, and she had no ideas of reference, phobias, obsessions, compulsions or suicidal ideation, hallucinations or delusions. (Id.) Dr. Williams opined that Kiara's insight, understanding of herself and judgment were limited, and that her estimated intelligence was borderline. (Id.) She diagnosed Kiara with an adjustment disorder with depressed mood, and estimated that she would likely have a favorable response, as treatment continues. (Id. at 232).

On March 31, 2003, Patricia T. Hinton, Ph.D. ("Dr. Hinton") reviewed Kiara's medical records and other materials, and completed a disability evaluation form. (Tr. 233-240). Dr. Hinton found that while Kiara's impairments are severe, she suffers no limitations in the domains of attending and completing tasks, interacting and relating with others, moving about and manipulating objects and health and physical well-being; and a less than marked limitation in the domains of acquiring and using information and caring for herself. (Id.) With respect to the domain of acquiring and using information, Dr. Hinton noted Plaintiff's report that Kiara is able to progress in learning but has

12

problems with reading, math and telling time, and that she is in special education classes for reading, language, arts and math. (Id. at 235). She further noted that Plaintiff's teacher at Calloway had opined that with respect to the domain of acquiring and using information, Kiara has "obvious" problems in about 6 out of 10 areas and "slight" problems in the other areas. (Id.)

From February 4, 2003 to December 16, 2003, Kiara was treated at the LeMoyne Center of Mobile Mental Health Center ("MMHC") by Vincene Dillon, M.D. ("Dr. Dillon"). (Id. at 241-265). Kiara was initially diagnosed with major depressive disorder, recurrent, unspecified; learning disorder not otherwise specified; rule out borderline intellectual functioning; and rule out mild mental retardation. (Id. at 261). The discharge criteria was that she should be able to express her feelings in a more positive way and eliminate all thoughts of suicide. (Tr. 261).

In June 2003, Dr. Dillon diagnosed Kiara with major depressive disorder; learning disorder, not otherwise specified; rule out mild mental retardation; and rule out borderline intellectual functioning. (Id. at 248, 252). He recommended continued individual therapy and prescribed Zoloft. (Id. at 248, 255). During the course of Kiara's treatment, she complained about other kids picking on her and her mood was sometimes sad. (Id. at 249, 256, 259-263). However, the notes reflect that she typically had an appropriate appearance and affect, and denied self injurious behavior or suicidal or homicidal thoughts. (Id. at 241-265). Her perceptions were logical, coherent and within normal limits. (Id.) Her memory and concentration were generally found to be unimpaired; however, there are a couple of entries where it is noted that her memory/concentration was impaired. (Tr. 241-242, 247, 256-258).

By July 2003, Plaintiff reported great improvement in Kiara's mood, and that she was compliant with her medication. (Id. at 247). During the September/October 2003 time frame, the

records reflect that Plaintiff reported that Kiara's mood had improved tremendously, and that she was doing good with her medication and earning good grades in school. (Id. at 243-244). It was noted that Kiara's third 90 day treatment plan review reflected that her mood had improved tremendously, she could make at least 1 positive statement about herself each session and had almost eliminated suicidal thoughts; however, it was noted that she and her sister still argued daily. (Id. at 243). The final entry for December 16, 2003 reveals that Kiara had appropriate appearance and affect; normal behavior and mood; no speech impairment; good sleep and appetite (excessive sleep); no self-injurious behavior, or suicidal or homicidal thoughts; her thoughts and perceptions were logical, coherent and within normal limits; however, her memory and concentration were impaired and her mother reported that she was not taking her medications. (Id. at 241).

On January 4, 2004, State Agency medical consultant Peter S. Bertucci, M.D. ("Dr. Bertucci") reviewed Kiara's records and completed a childhood disability evaluation form in which he assessed her impairments and determined that they did not equal the Listing. (Id. at 266-271). Dr. Bertucci concluded that Kiara had a less than marked limitation in the domains of acquiring and using information and attending and completing tasks (after considering her 1997 and 2001 test scores, EMR classes and teacher ADLs which reflected "some obvious" but "not serious" problems); a marked limitation in the domain of interacting and relating with others; and no limitations in the domains of moving about and manipulating objects, caring for herself and health and physical well being. (Tr. 269-270).

**1.   The ALJ did not err in finding that Kiara does not suffer from a marked limitation in the domain of acquiring and using information.**

Based on the totality of the record evidence, the undersigned finds that the ALJ did not err in concluding that Kiara has a less than marked limitation in the domain of acquiring and using information. While the record reflects that Kiara had to repeat the first grade and has learning difficulties which required that she be placed into special education classes, the record clearly reflects that her school performance has improved.

For instance, in the teacher questionnaire completed in June 1998, when Kiara was eight years old, the teacher noted that she performed below her age level academically in comparison to normal children her age, and that she was academically and socially deficit when compared to her age group. (Tr. 81-83). In a subsequent questionnaire, completed in January 2003, when Kiara was age 14 years of age, her teacher opined that she had a slight problem comprehending oral instructions, providing organized oral explanations and adequate descriptions, learning new materials, and recalling and applying previously learned materials. (Id. at 143). She also opined that Kiara had obvious problems understanding school and content vocabulary, reading and comprehending written material, comprehending and doing math problems, understanding and participating in class discussions, expressing ideas in written form and applying problem solving skills in class discussions. (Id.) Interestingly, the teacher did not find, however, that Kiara had any "serious" or "very serious" problems in the domain of acquiring and using information. (Id.) She also determined that Kiara had no problems in the domains of interacting with others, attending to and completing tasks, moving about and manipulating objects, or caring for herself. (Id. at 144-148). Moreover, in 2002, while some of the Calloway teachers noted that Kiara had a poor attitude, rarely participated in class and engaged in girly activities like writing notes, the record reflects that she was passing all of her classes.

(Id. at 156). It is also noteworthy that in 2003, in conjunction with Kiara's counseling, her mother reported that with medication, her mood had improved and her grades were good. See supra. Additionally, in March 2003 and January 2004, Dr. Hinton and Dr. Bertucci respectively reviewed Kiara's medical and academic records, and both concluded that she has a less than marked limitation in the domain of acquiring and using information. (Id.)

Moreover, while Kiara has received mental health treatment, and was diagnosed by Dr. Dillion with major depressive disorder, learning disorder, not otherwise specified, rule out mild mental retardation and borderline intellectual functioning, no doctor has opined that her impairments meet, medically equal or functionally equal the listing. Nor has any doctor opined that Kiara has marked limitations in the domain of acquiring and using information. Accordingly, the undersigned finds that the ALJ did not err in concluding that Kiara has less than marked limitations in the domain of acquiring and using information.

### 2. The ALJ did not err by not obtaining a disability opinion from Dr. Dillon, and in assigning appropriate weight to Dr. Bertucci's opinion.

Plaintiff's assertion that the ALJ erred, by failing to obtain an opinion from Dr. Dillon (Kiara'a treating physician) regarding her limitations in the domain of acquiring and using information, is without merit. While the regulations provide a procedure for recontacting a treating physician when the medical opinions expressed are vague or unclear (i.e., inadequate), that was simply not the case with respect to Dr. Dillon's treatment records. See, e.g., 20 C.F.R. §§ 416.912(e), 404.1512(e). His records contain detailed entries, including his diagnoses and treatment of Kiara. See supra. Consequently, it was not necessary for the ALJ to seek additional information from him.

The ALJ's reliance on the opinions of a non-examining medical consultant and a State Agency doctor was proper, because their findings constitute expert opinion evidence and was entitled to

appropriate weight. See, e.g., 20 C.F.R. §§ 416.927(f), 404.1527(f). As noted supra, Dr. Hinton and Dr. Bertucci independently evaluated Kiara's medical evidence and academic records, and concluded that she has less than marked limitations in her ability to acquire and use information. Their findings do not contradict the opinions of any treating or examining doctors and are consistent with the record evidence. Accordingly, the ALJ did not err in relying on their opinions and in concluding that Plaintiff is not disabled.

**V.     Conclusion**

For the reasons set forth, and upon consideration of the administrative record and memoranda of the parties, it is the **RECOMMENDATION** of the undersigned that the decision of the Commissioner of Social Security denying Plaintiff's claim for supplemental security income benefits, on behalf of her child, is due to be **AFFIRMED.**

The attached sheet contains important information regarding objections to this report and recommendation.

**DONE** this the **11th** day of **September, 2006.**

       /s/ Sonja F. Bivins
**UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.      **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(c); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      **Opposing party's response to the objection.**  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.      **Transcript (applicable where proceedings tape recorded)**.  Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

                                                        **/s/ SONJA F. BIVINS**
                                                        **UNITED STATES MAGISTRATE JUDGE**